# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian S., | Case No. 18-cv-1893 (HB) |
| Plaintiff, | |
| v. | |
| Andrew Saul,[1] <br> Acting Commissioner of Social Security, | **ORDER** |
| Defendant. | |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Brian S. seeks review of the Acting Commissioner of Social Security's (the "Commissioner") denial of the claimant's application for supplemental security income ("SSI").[2] *See generally* (Compl. [Doc. No. 1].[3]) The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J. [Doc. No. 13]; Def.'s Mot. for Summ. J. [Doc. No. 16].) For the reasons set forth below, the Plaintiff's Motion for Summary Judgment will be denied and the Commissioner's Motion for Summary Judgment will be granted.

---

[1] Andrew Saul was sworn in as the Acting Commissioner of Social Security on June 17, 2019, and has been substituted pursuant to Federal Rule of Civil Procedure 25(d).

[2] The Social Security Administrative Record ("R.") is available at Doc. No. 12. For clarity, when citing to the record, the Court uses the pagination as marked in the record (on the bottom right of each page) rather than the CM/ECF pagination.

[3] In briefing his Motion for Summary Judgment, Plaintiff did not challenge the ALJ's decision with respect to his disability insurance benefit ("DIB") claim alleged in his Complaint. *See, e.g.*, (Pl.'s Mem. in Supp. [Doc. No. 14 at 1 n.1].) The Court therefor focuses on his SSI claim.

# I.    BACKGROUND

## A.    Procedural History

On January 30, 2015, Plaintiff protectively filed for SSI benefits.  *See, e.g.*, (R. 10, 86).  Plaintiff alleged the he was disabled due to "Multiple conditions"; "Arthritis-Whole Body"; "Knee Pain"; and "Low Back Pain."  *See, e.g.*, (*id.* at 86.)  Plaintiff asserted an alleged onset date ("AOD") of January 1, 2009.  (*Id.*)

The ALJ issued an unfavorable decision on May 23, 2017.  (R. 10–21).  Pursuant to the five-step sequential evaluation procedure outlined in 20 C.F.R. § 416.920(a), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since at least his AOD of January 1, 2009.  (*Id.* 12.)  At step two, the ALJ determined that the claimant had severe impairments of "arthritis and organic mental disorder."  (*Id.* 12.) The ALJ found at the third step that no impairment or combination of impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id.* 13–14).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC")[4]

> [T]o perform light work . . . except he requires a sit/stand option every half hour and he would need to move about for three minutes while remaining on task.  He can occasionally climb ramps and stairs.  He can never climb ladders, ropes, or scaffolds.  He can occasionally stoop, kneel, crouch, and crawl.  He is limited to performing simple, routine tasks and making simple

---

[4]  An RFC assessment measures the most a person can do, despite his or her limitations. 20 C.F.R. § 416.945(a)(1).  The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

work related decisions. He can have occasional, brief, and superficial
interactions with the public, coworkers, and supervisors.

(*Id.* 14.) The ALJ also found at step four that Plaintiff was not able to perform his past

relevant work as a progressive assembler and fitter and meat clerk. (*Id.* 19.) The ALJ

based this conclusion largely on testimony from the vocational expert that "an individual

of the claimant's age, education, vocational background, and residual functional

capacity" was incapable of performing such work. (*Id.*)

At step five, however, considering Plaintiff's age, education, work experience, and

RFC, the ALJ found Plaintiff could work in jobs that exist in significant numbers in the

national economy, including: housekeeping cleaner, small products assembler, and bench

assembler. (*Id.* 20.) Thus, the ALJ concluded that Plaintiff was not disabled. (*Id.* 21.)

Plaintiff sought review by the Appeals Council, which denied his request. (R. 1–

6). The ALJ's decision therefore became the final decision of the Commissioner. (*Id.*);

*see also* 20 C.F.R. § 416.1481. Plaintiff then commenced this action for judicial review.

Plaintiff contends the ALJ erred in evaluating the claimant's impairments and in

determining that the claimant is not disabled because, *inter alia*, the ALJ did not provide

good specific reasons—supported by the evidence—to explain why opinions of

Mary Lamusga, RN, PAC, A. Neil Johnson, MD, Ed Modahl, MS.Ed., LP, and

Sheila Froemming, MD, were discounted. (Pl.'s Mem. in Sup. at 5–18.) Plaintiff also

asserts that if those opinions were afforded proper weight, the ALJ's determination is not

supported by substantial evidence. (*Id.* at 9–10.) Consequently, Plaintiff requests that

the case be remanded to the Commissioner for further administrative proceedings pursuant to 42 U.S.C. § 405(g).  (*Id.* at 18.)

## B.    Factual Background[5]

### 1.    Plaintiff's Background and Testimony

At the time of his AOD, Plaintiff was thirty-eight years old, and therefore a "younger person."  20 C.F.R. § 416.963(c).  (R. 86.)  Plaintiff has a high school education, "but all through school" he attended special education.  (*Id.* 39; *see also id.* 242.)  From April 1997 until January 2003, Plaintiff worked as an assembler for a landscaping business.  (*Id.* 265.)  From September 2003 until November 2004, Plaintiff worked as a meat processor.  (*Id.*)  There is no reported employment income after 2004. (*Id.* 225.)

At a March 2017 hearing before the ALJ, Plaintiff testified that he was single and living in a home by himself, but that he was receiving a relative's help to handle the mortgage payments because he "can't afford [them]."  (*Id.* 39.)  At home, he cares for two dogs and a cat.  (*Id.* 49–50.)  To pass the time, he watches TV, sitting as long as he can before getting up and moving around, and when it's nice out, he tries "to get what exercise I can get."  (*Id.* 51.)  Plaintiff also testified that he is able to wash and dress himself, but he uses a chair in the shower so he does not need to stand, except when he washes his hair.  (*Id.* 51.)  Plaintiff also discussed other assistive devices in his home,

---

[5]  The Court has reviewed the entire administrative record thoroughly, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

including rails on the walls, and an elevated toilet seat. (*Id.* 51.) In response to questioning by his attorney, Plaintiff also testified that a cane that Plaintiff had with him was prescribed by a doctor, and that he has it with him all the time. (*Id.* 46.) Plaintiff testified that he could only walk about 200 feet with or without his cane. (*Id.* 55.)

He further testified that he had some trouble reading but had some assistance in that respect. (*Id.* 39–40.) That said, Plaintiff stated that he had no problems making change at a store, paying bills, or otherwise handling his finances. (*Id.* 40.) With respect to other activities of daily living, Plaintiff testified that he does dishes, but that he has "to be very careful because I drop them and break them" because he has trouble making a fist and holding on to things. (*Id.* 42–43.) He also stated that he does his own shopping, although he has to "lean up against the grocery cart" to help him mitigate the pain in his lower extremities and he makes frequent stops as he walks down the aisles. (*Id.* 44–45.) He also mentioned trying to use electronic carts and scooters when shopping, but noted that oftentimes they are not available. (*Id.* 45.) Plaintiff also testified that his impairments now prevent him from hunting or fishing and he has not engaged in those activities in at least five years. (*Id.* 50.)

Plaintiff testified that he is able to prepare his own meals, and uses a grill during the summer, although he needs to be seated while using the grill. (*Id.* 52.) With respect to his cooking, Plaintiff stated that he does not follow recipes; he will "just throw things together and make it taste good." (*Id.*) Plaintiff also testified that although he had some help with reading, he received no help with grocery shopping, doing household chores, yard work, or paying bills. (*Id.*) In response to questions from the ALJ, Plaintiff stated

that it "takes me all day to mow my grass because I mow for a while." (*Id.* 53.) Plaintiff estimated that his lawn was about an acre and that he used a riding mower to mow his lawn. (*Id.*)

With respect to other aspects of his impairments, Plaintiff stated that he has pain in his knees, back, wrists "going into [his] shoulders" and that his "ankles are starting to pop." (*Id.* 42.) Plaintiff testified that an unnamed doctor told him his arthritis was "unbelievable," and because of his arthritis he was unable to bend one of his fingers and one wrist "don't move." (*Id.* 43.) He stated that he cannot sit for too long and needs to get up from time to time to manage his pain. (*Id.* 45–46.) He takes medication three times per day as prescribed by his doctors to manage his arthritis but that "it's not doing me no good yet." (*Id.* 47.) Plaintiff stated that his sleep is sometimes interrupted by his pain. (*Id.* 54.)

### 2.    Relevant Evidence

#### a.    Plaintiff's Functional Reports

As part of his application for benefits, Plaintiff completed two functional reports in 2015. *See, e.g.*, (*id.* 246–63, 282–89.) In both reports, Plaintiff indicated no problems with many activities of daily living, including dressing, bathing, shaving, using the toilet, and attending to other personal care needs. (*Id.* 249, 283.) He stated he cooked daily, prepared each meal, which were "complete meals with several courses." (*Id.* 250; *see also id.* 284.) Plaintiff noted it could take thirty minutes to an hour to prepare each meal. (*Id.* 250.) Plaintiff was able to clean, do laundry, mow his lawn, and remove snow, and these tasks could take twenty minutes to two-and-a-half hours. (*Id.* 250; *see also id.*

284.)  Plaintiff also indicated that he could drive and shop for himself for both food and

clothing.  (*Id.* 251, 285.)  Plaintiff stated that his impairments affected his ability to hunt

and fish, but that he tries to do "it in the season when I can walk."  (*Id.* 252; *see also id.*

286.)  Plaintiff stated that he used no mobility aids, including a cane.  (*Id.* 254, 288.)

### b.   Medical Evaluations and Treatment

On May 19, 2011, Plaintiff met with Dr. Froemming, a doctor of family medicine,

to discuss his concerns regarding joint pain and swelling.  (*Id.* 334–41.)  Dr. Froemming

noted Plaintiff had some swelling in face and hands.  (*Id.* 335.)  She stated he had "good

range of motion of the upper and lower extremities," and that Plaintiff was "actually

more concerned about the popping noise that he hears when he moves his fingers or his

knees."  (*Id.*)  She did "not note any erythema or swelling of any joints in particular other

than again to note the diffuse swelling in his hands."  (*Id.*)  Dr. Froemming's primary

concern seem to be with Plaintiff's family history of thyroid disease.  (*Id.*)  She ordered

various tests to assess the functioning of his thyroid, and if that was normal, the plan

would be "for further evaluation with ANA and rheumatoid" tests.  (*Id.*)  An imaging

study of his thyroid suggested possible thyroiditis.  (*Id.* 337.)  An ultrasound of Plaintiff's

hands was largely unremarkable; "[j]oint spaces [were] well maintained" there was no

"evidence for cortical destruction or erosions" and soft tissue swelling was limited to "the

medial aspect of the left index finger."  (*Id.* 339.)  Tests related to Plaintiff's lumbar and

thoracic spine were negative.  (*Id.* 340–41.)

Plaintiff followed up with Dr. Froemming on October 6, 2011.  (*Id.* 345–46.)  She

noted Plaintiff's diagnosis of hypothyroidism back in May 2011.  (*Id.* 345.)  As part of

that diagnosis, Dr. Froemming stated that Plaintiff was given a two-month supply of medication, but was "advised that he follow up in clinic for repeat labs and further evaluation. He did not follow that advice, and today is the first visit back to the clinic." (*Id.* 345.) Additional imaging studies were ordered based on Plaintiff's complaints of joint pain in his hands and back. (*Id.* 346.)

On December 30, 2011, Plaintiff was again seen by Dr. Froemming. She noted "[i]t has been approximately thee months since his last visit, and he has generally been coming in when his medication runs out rather than every six to eight weeks as recommended so that we can get his hypothyroidism appropriately treated." (*Id.* 342.) Dr. Froemming also noted that Plaintiff indicated the medication he was on to treat his hypothyroidism noticeably reduced the swelling in his face and hands. (*Id.*) She also stated that she had "prescribed him a trial of meloxicam at his last visit" to address pain stemming from what Plaintiff believed to be arthritis, and that Plaintiff stated "this medication is very helpful for him." (*Id.*) In this treatment note, Dr. Froemming also discussed Plaintiff's request for her to fill out disability paperwork for him. (*Id.* 343.) She noted that she asked him about his learning disability and that he responded that he was unable to read "other than signing his name and writing some numbers." Based on what she "gathered from our visits and what he has told me about his learning disability" her treatment note reflected her skepticism that he would "be able to maintain any type of gainful employment." (*Id.*) Finally, to help address Plaintiff's complaints of back pain, Dr. Froemming recommended physical therapy, which Plaintiff declined. (*Id.*)

Plaintiff also treated with Ms. Lamusga, a registered nurse and physician assistant. In an August 29, 2014, visit with Ms. Lamusga, Plaintiff indicated that his back and knee pain was worsening. (*Id.* 361.) Upon examination, Ms. Lamusga noted no erythema or swelling in Plaintiff's knees, and observed that he was sitting comfortably. (*Id.* 363.) Plaintiff appeared to have full range of motion in his knees, but "patient's effort was limited secondary to pain." (*Id.*) Ms. Lamusga also observed Plaintiff had an antalgic gait and mild tenderness to palpation. (*Id.*) With respect to Plaintiff's spine, the physical examination was largely normal, and Plaintiff had only mild tenderness to palpation. (*Id.*) Ms. Lamusga reported that Plaintiff indicated an inability to squat and to walk on his toes and heels. (*Id.*)

On October 10, 2014, Ms. Lamusga again treated Plaintiff for his ongoing complaints of joint pain and swelling. (*Id.* 356–60.) Ms. Lamusga indicated that Plaintiff complained that he could "hardly move" due to this pain. (*Id.* 356.) She noted Plaintiff presented with joint swelling and decreased ranged of motion. Plaintiff was also seen limping and "slow to get up from chair and straighten out." Ms. Lamusga also noted that there was "no clubbing, cyanosis, edema, or deformity noted with full range of motion of all joints" in Plaintiff's extremities. (*Id.*) Ms. Lamusga opined that Plaintiff's arthritis had deteriorated since the last visit. (*Id.* 359.) As part of this visit, Plaintiff also underwent imaging studies of his joints. (*Id.* 352–55.) The imaging studies were largely unremarkable. For instance, with respect to his knees "[n]o facture, dislocation, soft tissue calcifications, erosive or expansile change is noted." (*Id.* 352, 355.) Likewise with respect to the right hand, "[n]o abnormality of the right hand is identified" and "no

significant arthritic changes" were noted.  (*Id.* 354.)  That said, there was some soft tissue swelling noted in the left hand and a "[s]mall linear metallic radiopaque foreign body" was noted in the soft tissue.  (*Id.* 353.)

On January 19, 2015, Plaintiff again saw Ms. Lamusga.  (*Id.* 348–51.)  In this treatment note Plaintiff "[c]omplains of muscle aches, muscle weakness, back pain, joint swelling and joint pains."  (*Id.* 349.)  Ms. Lamusga noted joint tenderness and decreased range of motion.  (*Id.*)  She opined that his joint pain and arthritis had deteriorated, *see* (*id.* 350), but did not change the recommended course of treatment.  (*Id.* 351.)

On May 18, 2016, Plaintiff was again seen by Ms. Lamusga.  She noted swelling and tenderness at all joints in his fingers, hand, and wrist, *see* (*id.* 429).  Ms. Lamusga also noted the "joints involved are . . . deformed," (*id.*), but an imaging study of those areas was found to be largely unremarkable when compared to the imaging study conducted on October 10, 2014.  (*Id.* 430–34.)  For instance, with respect to the right hand, "mild degenerative narrowing of the radiocarpal joint" was observed, and the "[r]emainder of the right hand and wrist [were] otherwise unremarkable."  (*Id.* 431.)  Left hand images were unremarkable in comparison to images taken in 2014.  (*Id.* 432.)

None of the medical records suggests that Plaintiff was ever prescribed a cane to aid in his mobility.  In addition to the above, and particularly relevant to determinations before the Court, the record includes additional opinions from Ms. Lamusga, Dr. Johnson, and Mr. Modahl.

### i.    Ms. Lamusga

On January, 19, 2015, Ms. Lamusga provided a medical source statement setting forth her opinion regarding Plaintiff's impairments.  (*Id.* 325–29.)  The statement form included the instruction to the provider that "it is important that you relate particular medical findings to any reduction in capacity: the usefulness of your opinion depends on the extent to which you do this."  (*Id.* 325.)  Ms. Lamusga opined that Plaintiff could only lift ten pounds occasionally, less than ten pounds frequently, could stand and walk for a maximum of less than two hours, could sit for a maximum of less than two hours, never twist, stoop, climb ladders, rotate or flex his neck.  (*Id.* 325–26.)  In support of these opinions Ms. Lamusga stated that generalized arthritis, pain in joints at multiple sites, and Plaintiff's physical therapy evaluations supported her opinion.  (*Id.* 326.)  Ms. Lamusga also opined that Plaintiff should avoid all exposure to extreme temperatures, wetness, humidity, vibrations, and hazards, such as heights and machinery.  (*Id.* 328.)  When prompted to provide medical findings that would support these limitations, she stated "all will exacerbate symptoms," without providing additional explanation.  (*Id.*)

A physical therapy assessment included with and referenced by Ms. Lamusga's medical source statement indicated that Plaintiff had difficulty lifting more than five pounds overhead due to pain, and the maximum floor to waist crate lift was ten pounds.  (*Id.* 467.)  Plaintiff indicated 10/10 pain when attempting to lift twenty pounds.  (*Id.*)

### ii.    Dr. Johnson

Plaintiff was referred to Dr. Johnson, a doctor of internal medicine, for a consultative examination, which occurred on May 14, 2015.  (*Id.* 366–70.)  As part of this

examination, Dr. Johnson measured the range of motion of the Plaintiff's back, knees, fingers, and wrists. These measurements were generally within normal ranges. (*Id.* 367–69.) Dr. Johnson noted that he "didn't see any deformities" and that "[t]here [is] a disconnect between the symptomology and the findings." (*Id.* 367.) A radiology report of Plaintiff's lumbar spine showed no abnormalities. (*Id.* 373.)

Dr. Johnson opined as to Plaintiff's mental and physical capabilities. (*Id.* 370.) As for his mental impairments, Dr. Johnson opined that "[t]he patient has a severe learning disability. He is going to have a hard time functioning in the work force simply due to [the] learning disability. He states that he handles his own financial affairs but I am not sure how." (*Id.*) Dr. Johnson gave no opinion pertaining to Plaintiff's ability to work based on his physical impairments. On the specific subject of Plaintiff's complaints of joint paint due to arthritis, Dr. Johnson opined that he did not "see any deformity. I see no sign of rheumatoid arthritis. The pain is the limiting factor." (*Id.*)

### iii. Mr. Modahl

Mr. Modahl, a licensed psychologist, assessed Plaintiff's intellectual functioning on July 22, 2015. (*Id.* 416–20.) Prior to testing, Mr. Modahl observed that Plaintiff's hands shook and that he walked with a limp. (*Id.* 418.) As part of Plaintiff's evaluation, he was given a WAIS-IV full scale IQ test. Plaintiff's full scale and composite scores of 70 placed him "within the borderline to mildly impaired level of functioning." (*Id.* 419.) Based on a combination of social impairments due to perceived isolation, cognitive deficits, particularly as it relates to language, and "significant health issues" related to motor functioning, Mr. Modahl opined that "it is highly unlikely that [Plaintiff] will be

able to find and keep employment." (*Id.* 420.)  And "[b]ased upon assessment of objective and clinical observations" Mr. Modahl further opined "that [Plaintiff] will have difficulty understanding, remember[ing], and follow[ing] directions due to cognitive deficits.  He further appears to be unable to carry out work-like tasks for up to several hours at a time most days with sufficient persistence and pace due to cognitive deficits and physical health issues." (*Id.*)

### c.    State Agency Consultant Opinions

In a report dated August 11, 2015, Charles Grant, MD, an endocrinologist, and Mary Sullivan, Ph.D., a neuropsychologist, provided opinions as to Plaintiff's physical and mental impairments, respectively. (*Id.* 93–103.)

Dr. Grant opined that Plaintiff had the residual functional capacity to occasionally lift and carry fifty pounds and frequently carry twenty-five pounds. (*Id.* 98.)  Dr. Grant also opined that Plaintiff could walk or stand for six hours in an eight-hour workday or sit six hours in an eight-hour workday. (*Id.*)  Dr. Grant believed Plaintiff had few postural limitations, specifically limiting Plaintiff to climbing ramps, stairs, ladders, ropes, and scaffolds occasionally. (*Id.* 98–99.)  In support of these opinions, Dr. Grant pointed to the various imaging tests that were unremarkable, and to Plaintiff's own self-reporting from which Dr. Grant concluded that he "remains quite functional" as to his activities of daily living. (*Id.* 93.)  With respect to Ms. Lamusga's medical source statement, Dr. Grant noted that it was prepared by a physician's assistant, and that her "[c]onclusions are in excess of what would be expected" based on the established examinations and imaging findings. (*Id.*)

With respect to Plaintiff's mental impairments, Dr. Sullivan opined that Plaintiff's WAIS-IV test results "are grossly out of proportion to [Plaintiff's] daily living capabilities" and "[a]ssuming [intellectual disability] is lifelong, [Plaintiff] would have been unable to do the work he says he has done in the past, namely meat processing and landscaping/assembly." Dr. Sullivan identified other aspects of the record where Plaintiff's responses to evaluators were inconsistent with the answers he provided in other contexts. For instance, "[d]espite telling the panelist he no longer hunts or fishes, reports on the [form] he both hunts and fishes in season depending on his ability to get out." Dr. Sullivan found Plaintiff to be "partially credible at best," *see* (*id.* 101), and given the various inconsistencies between Plaintiff's statements to consultative examiners and medical providers, and information he provided in his own functional reports, she raised the concern that he was misrepresenting his true capabilities. (*Id.* 91.)

In a report dated September 24, 2015, Richard Hadden, MD, and James Alsdurf, Ph.D, LP, were asked to reconsider Plaintiff's impairments on the basis of Plaintiff's alleged worsening condition. (*Id.* 122–37.) Each concurred with the initial opinions proffered by Dr. Grant and Dr. Sullivan. *See generally* (*id.*)

## II. DISCUSSION

### A. Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."

14

*Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  That said, the Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

## B.    Analysis

Plaintiff argues that the ALJ erred in the manner in which he discounted the opinions of Ms. Lamusga, Dr. Johnson, Mr. Modahl, and Dr. Froemming.  So long as the ALJ provides a reasonable basis supported by substantial evidence of record for discrediting other evidence, the Court must defer to those determinations.  *See Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001) (explaining that deference to ALJ is appropriate when ALJ explicitly discredits claimant and presents a reasonable basis for doing so).  The Court concludes that the ALJ provided a reasonable basis to discount the opinions of each of these providers.

### 1.    Ms. Lamusga

The ALJ gave little weight to Ms. Lamusga as Plaintiff's treating nurse and physician's assistant.  (R. 17.)  In particular, the ALJ noted that Ms. Lamusga's opinions contained in her medical source statement were overly restrictive because they were

inconsistent with "the lack of significant findings on the diagnostic imaging studies."

(*Id.*)  The ALJ also cited Plaintiff's "relatively routine and conservative treatment as well

as the evidence of the claimant's daily activities" and lapses in care to support his

decision.  (*Id.* 16, 17.)  Furthermore, the ALJ noted that while Ms. Lamusga stated that

Plaintiff could not walk without a cane when she completed an application on behalf of

Plaintiff for a disability parking placard, "there is no evidence that a cane was

prescribed." (*Id.* 17.)

As an initial matter, because Plaintiff's claim was filed before March 27, 2017,

Ms. Lamusga did not qualify as an "acceptable medical source," *see* 20 C.F.R.

§§ 416.902(a)(7)-(8), and therefore these opinions were not from a "treating source" and

did not qualify as a "medical opinion."  20 C.F.R. §§ 416.927(a)(1)-(2).  That aside, the

ALJ provided good reasons for discrediting Ms. Lamusga's opinions in the medical

source statement because Ms. Lamusga's opinions were inconsistent with the record.

*See, e.g.*, *Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014) (because there was

"no evidence in the record that he or any other physician prescribed Toland a cane or

other assistive device for walking" and "Toland's self-reported abilities" in activities of

daily living were inconsistent with the medical provider's opinion, the ALJ properly

discredited that opinion evidence); *Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir.

2005) (inconsistency with other evidence is a sufficient justification to discount an

opinion).

Furthermore, the ALJ rightly discounted Ms. Lamusga's opinion with respect to

Plaintiff's impairments because Plaintiff never sought treatment from her for his mental

impairments, and Plaintiff's treatment for his physical impairments was conservative. For instance, Plaintiff seems to have relied primarily on prescription medication, and at times declined other forms of treatment when prescribed. Dr. Froemming also noted that Plaintiff was not following medical advice for more aggressive monitoring of his hypothyroidism. *See, e.g.*, (R. 342–43); *cf. Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) ("conservative treatments were inconsistent with" claims of disabling pain); *see also Lovell v. Colvin*, 137 F. Supp. 3d 347, 354 (W.D.N.Y 2015) (conservative medical treatment supports a finding "that plaintiff is not as restricted as he claims"). Furthermore, the ALJ did not err by considering Plaintiff's nearly two-year lapse in obtaining medical care for his alleged impairments. *See, e.g.*, *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995) ("Failure to seek aggressive medical care is not suggestive of disabling pain.").

Nor is there any basis in the record to require the ALJ to give greater credence to the opinions Ms. Lamusga gave in 2016. Beyond Plaintiff's subjective complaints, there is little objective medical evidence to suggest a worsening of his condition. For example, in May 2016, Ms. Lamusga noted swelling and tenderness at all joints in his fingers, hand, and wrist, *see* (*id.* 429). Ms. Lamusga also noted the "joints involved are . . . deformed," (*id.*), but an imaging study of those areas at that time was found to be largely unremarkable but for "[m]ild degenerative narrowing of the radiocarpal joint." (*Id.* 430.) This inconsistency also undermines Ms. Lamusga's opinion as to the severity of Plaintiff's impairments based on the noted "deformity." *Cf. Goff*, 421 F.3d at 790–91.

In sum, the ALJ did not err in discounting Ms. Lamusga's opinions about Plaintiff's impairments.

### 2.    Dr. Johnson

The ALJ gave partial weight to Dr. Johnson's opinion.  (*Id.* 17.)  Specifically, the ALJ concluded that Dr. Johnson's observation "that there was a disconnect between the claimant's symptomology and the objective findings" was "generally consistent with the evidence of record discussed herein."  (*Id.*)  But the ALJ accorded little weight to Dr. Johnson's opinion "that the claimant had a severe learning disability and that he would have a difficult time functioning in the work force due to the learning disability."  (*Id.*)  The ALJ explained he was discounting Dr. Johnson's opinion in this regard because, *inter alia*, the opinion was not consistent with the evidence in the record and "there [was] no evidence that Dr. Johnson is a mental health professional or that he formally evaluated the claimant for a mental impairment."  (*Id.*)

The Court concludes the ALJ provided good reasons supported by substantial evidence in the record to support his decision to discount Dr. Johnson's opinion.  First, it is well established that an ALJ may discount or disregard opinion evidence that is inconsistent with other objective evidence in the record.  *See, e.g.*, *Goff*, 421 F.3d at 790–91.  Here, the ALJ pointed to a number of facts in the record that militated against a conclusion that Plaintiff's mental impairments were disabling.  For instance, "the claimant is able to live alone and manage his finances," "the claimant is able to perform activities of daily living," and "[t]he claimant was able to perform work at or above the level of substantial gainful activity prior to the alleged onset date of disability."  (R. 16–

17.)  The ALJ found this last fact of particular relevance because "[t]here are no allegations or evidence in the record that the claimant's mental impairment worsened since high school or since the alleged onset date of disability."  (*Id.* 17.)  In this regard, it is noteworthy that Plaintiff did not file for disability benefits on the basis of his mental impairments.  *See, e.g.*, (R. 86.)  Thus, the record as a whole, including Plaintiff's activities of daily living and his years of gainful activity, are inconsistent with a conclusion that Plaintiff's mental impairments preclude employment.

Second, it is permissible for an ALJ to discredit opinions that are premised on a claimant's own subjective complaints in the absence of objective findings.  *See, e.g.*, *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence."); *cf. Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("The treatment notes from these sessions do not indicate that Vega had sufficient knowledge upon which to formulate an opinion as to Randolph's ability to function in a workplace.")  It is clear that Dr. Johnson relied in large part upon Plaintiff's subjective complaints.  (R. 366–70.)  As a result, the ALJ did not err in discounting Dr. Johnson's opinion.

### 3.    Mr. Modahl

The ALJ gave little weight to the opinion of the consultative examiner, Mr. Modahl.  (*Id.* 18.)  Specifically, the ALJ found Mr. Modahl's opinion that Plaintiff would struggle "to carry out work-like tasks with sufficient persistence and pace due to his cognitive deficits and physical health issues" to be at odds with Plaintiff's activities of

daily living, lack of mental health treatment in the record, and years of gainful work activity before the AOD.

For similar reasons stated above in connection with the opinion of Dr. Johnson, the ALJ's conclusion that Mr. Modahl's opinions should be discounted because they were not consistent with the other evidence of record is supported by substantial evidence. Specifically, Mr. Modahl's opinion that Plaintiff would struggle to work because of his mental impairments is inconsistent with Plaintiff's ability "to perform work at or above the level of substantial gainful activity prior to the alleged onset date of disability." (R. 16–17); *cf.*, *Goff*, 421 F.3d at 790–91. Also, Mr. Modahl's assessment of Plaintiff's physical impairments was not based on any objective testing that he conducted, and the ALJ's decision to afford this opinion little weight was appropriate under the circumstances. *See, e.g.*, *Kirby*, 500 F.3d 705, 709; *cf. Randolph*, 386 F.3d at 840.

### 4. Dr. Froemming

The ALJ gave little weight to Dr. Froemming's opinion regarding Plaintiff's ability to work because her opinion was premised on Plaintiff's mental impairments and was based on Plaintiff's subjective complaints, not on any objective findings by Dr. Froemming (because she never treated or even evaluated Plaintiff regarding his mental impairments). (*Id.* 18.) Similar to the above discussion, the ALJ provided good reasons for discrediting the opinion of Dr. Froemming, and each one is supported by substantial evidence. *See, e.g.*, *Kirby*, 500 F.3d 705, 709; *cf. Randolph*, 386 F.3d at 840.

Consequently, the Court concludes the ALJ did not err in the manner in which he evaluated and weighed the opinion evidence of Dr. Froemming.

## III.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff Brian S.'s Motion for Summary Judgment [Doc. No. 13] is **DENIED**; and

2.  The Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 16] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 29, 2019                      _s/ Hildy Bowbeer_____
                                             HILDY BOWBEER
                                             United States Magistrate Judge